**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE L. SATTERFIELD,** | : | |
| **Plaintiff,** | : | **Case No. 2:08-cv-387** |
| **v.** | : | **Judge Holschuh** |
| **JAMES A. KARNES, in both his** | : | **Magistrate Judge Abel** |
| **individual and official capacities,** | | |
| **FRANKLIN COUNTY SHERIFF,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION AND ORDER**

This is a sexual harassment case brought by Michelle Satterfield, who formerly worked as

a nurse at the Franklin County Sheriff's Office, against Sheriff Jim Karnes, in both his official and

individual capacities. Before the Court now is Defendant Karnes' Motion for Summary Judgment.

(Doc. 37.) For the reasons set forth below, this motion is granted.

**I. Facts**

Michelle Satterfield began working as a nurse at the Franklin County Sheriff's Office in late

2001. Although she was originally employed there through a contracting agency, she became a full-

time employee of the Sheriff's Office in 2004. In mid-2006, she separated from her husband, Joe

Satterfield, who is a deputy in the Office, and took a three-week leave of absence. Shortly after

returning from this leave in July 2006, Deputy Alan Mann, Jr. approached her and asked how she

was doing since separating from her husband. Satterfield knew Mann because she and her ex-

husband had gone out socially with Mann and his wife on a few occasions in the past. The two of

them exchanged cell phone numbers, and Mann told Satterfield to let him know if she ever needed

anything. Satterfield thought, at that point, that Mann was merely making a "friendly, nice gesture."

Deposition of Michelle Satterfield, Vol. II, at 274.

This gesture portended a turn for the worse in their relations, however, as Mann made an

obscene phone call to Satterfield a few weeks later. Satterfield was driving home from work when

Mann called her cell phone; her account of this call is as follows:

> [I p]icked up the phone, it was him on the phone, he said where are you at. Have you
> left the jail? And I said yeah, who is this? He said it's Alan Mann. And I said yeah,
> I've done left, why? He says are you on 70? And I said yeah. He goes pull over and
> let's go get a hotel room. I said no. He says well, then let me follow you home. I said
> no you're not following me home. He goes—then he proceeds to ask me if my
> pussy's shaved because he's always wanted to lick me up and down. I told him he
> was ignorant and I hung up.

Satterfield depo. at 272. Satterfield told her supervisor, Charge Nurse Dawn Spelling, about this

phone call, but Snelling was given the impression that Satterfield had told her as a friend and did

not want her to do anything about it as a supervisor. Deposition of Dawn Snelling at 25. Had

Snelling been given the impression that Satterfield wanted her to do something about this incident,

Snelling states that she would have reported it to her supervisor. Id. at 26. Instead, she did not report

it to anyone.

Nothing further happened between Mann and Satterfield until early October—most likely

on October 3, 2006. While Satterfield was at her post at the Corrections Center on Jackson Pike,

Deputy Mann came up from behind her and said "Just let me touch it once, just let me touch it

once." Doc. 55-1 at 35–36. He then grabbed her left breast with his left hand and attempted to place

his right hand between her legs. Satterfield pushed him away and said "no," so he left.

Satterfield then called Sergeant Steve Tucker, who had recently been transferred from the

Jackson Pike facility to the Main Jail, and told him about the attack. During this call, Mann returned

2

and stood in front of the bathroom door. After Satterfield hung up the phone, he forcibly grabbed and kissed her. In her words, he "snatched me by the back of my head, pulled my head back, my neck back, and put his lips on mine and said just let me—just kiss me once. Or just kiss me, something like that." Satterfield depo. at 287–88. She then tried to push him away. "[T]here was a little bit of a struggle and that's when he walked out." Id. at 288. About twenty minutes later, Deputy Mann called Satterfield's workstation and demanded to know why a supervisor was telling him to leave her alone. Doc. 55 at 30.

Satterfield reported this assault to Nurse Snelling the next day. According to Chief Deputy Mark Barrett, a supervisor who gets a report of sexual harassment "should document any action that they take with that report and then pass it on to their Chain of Command." Deposition of Mark Barrett at 9. Nurse Snelling advised Satterfield to "turn it in," but she also warned Satterfield that "you know you're going to get repercussions . . . [b]ecause of Deputy Alan Mann's dad." Satterfield depo. at 297. Deputy Mann's father, it turns out, is Major Alan Mann, Sr., and he was at that time in charge of the Patrol Division in the Sheriff's Office. Deposition of Alan Mann, Sr. at 5. A few days later, on October 7, 2006, Satterfield reported this conduct orally to Lieutenant Doug Edgington, who in turn reported it to Lieutenant Karen Cotner, the Equal Employment Opportunity Officer for the Sheriff's Office. Satterfield depo. at 309–10; Deposition of Karen Cotner at 7. On October 9, Lieutenant Edgington sent an email to a number of supervisors in which he stated that Deputy Mann was to have no contact with Satterfield except insofar as was necessary for the performance of their job duties. Doc. 55-3 at 106. He also stated that a written order was forthcoming from Chief Deputy Mark Barrett on this matter. Id. Sergeant Josh Short conveyed these instructions to Mann. Affidavit of Josh Short at ¶¶ 4–5. And on October 11, 2006, Chief Deputy

3

Barrett did issue a written order to Deputy Mann. His instructions to Mann were as follows:

> . . . you are hereby ordered to not have contact with or communicate, either verbally or in writing, with Nurse Satterfield unless such action is job-related. To the extent that any such contact and/or communications are necessary, you are to limit any such contact and/or communications to those that involve the dissemination of information that is necessary for the performance of your mutual job duties.

Doc. 55-2 at 34.

Satterfield filed a written complaint when she met with Lieutenant Cotner on October 12. Doc. 55 at 16; Cotner depo. at 7. An investigation by Lieutenant Cotner was then authorized on October 13. Satterfield was interviewed on November 15, and in this interview she stated that she had been told by a former nurse that Deputy Mann had previously harassed Nurse Nicole Randle (née Brown), who worked at the Sheriff's Office in early 2005. Doc. 55 at 30–31. In response to this, investigators interviewed Mrs. Randle the next day. She told them that Deputy Mann had asked her out when she worked at the Sheriff's Office. Lt. Cotner reported her allegations as follows:

> Ms. Brown-Randle said Deputy Mann had repeatedly asked her out on dates and she consistently refused. She said he frequently came to her assigned floor to pass medications when he was assigned to other areas. She said he came to her post to engage in lengthy sexual-in-nature conversations and ask her for dates. She said her resignation from the Sheriff's Office was in large part due to Deputy Mann's conduct. She felt like he treated her like a possession. Ms. Brown-Randle said her supervisor, Nurse Tomi Benedum, had approached her (Brown) about her (Brown) relationship with Deputy Mann due to rumors his wife had called FCCC II to complain. Ms. Brown-Randle said she felt humiliated by that since she had not encouraged his behavior in any way. She said she understood the time constraints for a sexual harassment complaint have expired, but wanted to offer her information if it would help to prevent Deputy Mann from repeating the same behavior.

Doc. 55 at 26. Nurses Snelling and Tomi Benedum (née Fraley) were interviewed on November 21 and December 6, respectively. Nurse Snelling told the investigators that she did not know Satterfield well, but when Satterfield reported the attack to her on the day it happened, she advised Satterfield to contact Deputy Mann's supervisor. Doc. 55 at 31–32. For her part, Nurse Benedum confirmed

4

that she had spoken with Mrs. Randle about the rumors involving Mann's wife calling the office to complain; she said that Mrs. Randle made it clear to her that Mann had been pursuing her and that she disliked him. Doc. 55 at 32. Nurse Benedum also contacted Sergeant Short in early 2005 to ask him to tell Mann to leave Randle alone, which he did. Short aff. at ¶¶ 2–3. Randle quit her job at the Sheriff's Office in May or June of 2005, at least in part because of Deputy Mann. Deposition of Nicole Randle at 32–33.

A few days after the interview of Nurse Benedum, on December 8, 2006, a second incident occurred between Satterfield and Deputy Mann. As Satterfield responded to a medical issue known as a "Code Blue," she looked around to see if a deputy was nearby to assist her as an escort for an inmate. As she turned her head to look behind her, Deputy Mann allegedly said "don't look at me." She filed a report for this incident that day to Chief Deputy Barrett, doc. 55 at 14, though Lt. Cotner stated that Satterfield reported it on December 13, doc. 55 at 26. In this report, Satterfield stated as follows:

> Nurse Daniel was some distance from us because he was walking faster. I turned my head to look behind me to see if we had a deputy escort close because if not I was going to tell Nurse Daniel to slow down. The minute I turned my head around I heard Deputy Mann yell "Don't look at me." After I heard him say that I immediately turned my head back around trying to ignore the comment. There were other deputies walking with him at this time. I arrived on my post with this inmate at 0345. I called Corporal Derrico and told him what had occurred. I was told by Internal Affairs to notify suspension if anything occurs regarding Deputy Mann. I felt embarrassed and it upset me. I felt that his comment was addressed to no one but myself.

Doc. 55 at 14. In response to this, Major Michael Herrell issued an order on December 15, 2006, that Deputy Mann was to be assigned "to the control center to perform his duties until further notice. He is to work no other assignments until you are notified otherwise." Doc. 55-2 at 39.

5

Sergeant Tucker was interviewed on January 18, 2007. He stated that Satterfield did call him on the night of the incident in early October. He also said that he told her to report the incident and advised her of her options, and that he followed up with her later to see if she had reported the incident or if he would have to. Doc. 55 at 33.

Deputy Mann was interviewed on February 7, 2007. In this interview, he adamantly denied all of Satterfield's allegations. Specifically, he denied ever making an obscene phone call to her in the summer of 2006 in which he asked her to go to a hotel. Doc. 63 at 6–7, 9–10, 17. He also denied touching Satterfield in any way and attempting to kiss her in early October. Id. at 7–8, 15–17, 24–26. Later that day, however, Mann's attorney contacted Lieutenant Geoff Stobart and told him that Mann wanted to "make it right" and revisit some of the statements he had made in his interview. Doc. 55 at 33.

A second interview was scheduled for February 15, 2007; in this interview, Mann was much more forthcoming. He admitted to touching Satterfield's breast and reaching for her crotch in the first incident on October 3. Doc. 63 at 30. He also admitted to kissing Satterfield later that night, though he claimed that rather than pull her hair, he simply put his hand on the side of her face. Id. at 30, 32. In addition, he admitted to having made sexual-in-nature comments to Satterfield over the phone, including asking her to go to a hotel with him. Id. at 30. On the other hand, he denied ever having made a comment to Satterfield during the December, 2006, "Code Blue." Id. at 29. And as for Nurse Randle, he admitted to having asked her out repeatedly during her time at the Sheriff's office in 2005. Id. at 31.

Major Mann, meanwhile, began to get involved on behalf of his son. On December 12, 2006, Major Mann called the Communications Center to request the number for Scott Blacker, the

Grievance Chairman for the Fraternal Order of Police. Lieutenant Cotner, the EEOC Officer, answered, and Major Mann, who seemed upset, informed her that some contact between Deputy Mann and Satterfield had occurred recently at the Jackson Pike facility. In the words of Lieutenant Cotner:

> He said that he was upset about the ongoing investigation and that he was going to hire an attorney for his son. He went on to say that if Deputy Mann was found innocent, then he would sue [Satterfield]. He also said his wife and daughter-in-law were very upset about whatever had occurred at [the Jackson Pike facility] and they were threatening to go there and possibly confront [Satterfield] and possibly assault her that night.

Cotner depo. at 16. Major Mann also went to the Sheriff himself on behalf of his son. Although it does not appear that Major Mann and Sheriff Karnes are extraordinarily close, they do know each other fairly well from having both worked at the Office for decades; in addition to their contact at work, the Sheriff used to frequent a restaurant that was run by Major Mann's wife on the south side of Columbus. He also attended Deputy Mann's wedding and once went to Major Mann's home for a Christmas party. When he approached the Sheriff about the case, Major Mann states that

> [The Sheriff] told me that he was awfully upset that my son had lied to Internal Affairs . . . and I reminded the Sheriff that, throughout the years, anyone that had lied to Internal Affairs, as long as they went back in and told the truth before the investigation was over, few of those people, if ever any, were ever charged. I reminded the Sheriff of that. And, of course, being a father, I pleaded for [my son's] job with everything in my power.

Deposition of Alan Mann, Sr. at 13–14. As for Satterfield's accusations, Major Mann states that he "probably" told the Sheriff that he believed "[i]t was a two-way street; that it had to be both parties involved," and that his son "had reason to believe that he could do that and it would be receptive—or she would be receptive." Id. at 14–15. Simply put, his message was that Satterfield must have been partly to blame for the attack.

7

At the conclusion of the Internal Affairs investigation, Lieutenant Cotner submitted her report to Chief Deputy Stephan Martin on February 21, 2007. Doc. 55 at 25. In this report, she concludes that Deputy Mann 1) committed sexual imposition under Ohio law through his sexual contact with Satterfield, 2) touched Satterfield's breast and touched or attempted to touch her pubic area, 3) kissed Satterfield against her will, 4) made sexual-in-nature comments to Satterfield over the phone, 5) made sexual-in-nature comments to Nurse Randle, and 6) lied to Internal Affairs during his initial interview. Id. at 27. She was unable to find that Deputy Mann had violated Chief Deputy Barrett's order not to have contact with Satterfield by saying "don't look at me!" during the December, 2006, "Code Blue" due to the fact that other witnesses claimed they did not hear anything. Id. Based on these conclusions, she recommended that 1) three administrative charges of creating a hostile work environment and sexual harassment be sustained against Mann due to his offensive touching of Satterfield, kissing her against her will, and sexual-in-nature comments to her; 2) one charge of lying to internal affairs be sustained against him for his February 7, 2007, interview; 3) one charge of failing to obey laws and ordinances be sustained against him, 4) two charges of unbecoming conduct be sustained against him for his actions with respect to both Satterfield and Randle; and 5) Mann be suspended or dismissed as a result of these charges. Id. at 28–29. Facing a termination hearing, Mann submitted his resignation, effective April 3, 2007. Doc. 63 at 2.

In the middle of the investigation into Deputy Mann's actions, Satterfield herself engaged in unlawful conduct. On January 14, 2007, she and another individual were arrested for stealing several items from a Meijer grocery store in Newark, Ohio, with the help of Satterfield's daughter, who was working as a cashier. They attempted what was known to the security staff in the store as

a "slide": Satterfield waited in line for the register at which her daughter was working, even though other lines were shorter, and placed a large amount of merchandise on the belt. When she reached the register, her daughter scanned most of the merchandise, but then voided many of the items and used a bogus coupon to further reduce the overall charge. In all, Satterfield paid $10.31 for a 20" television, a picture frame, a wastebasket, a rug, a glass lantern, multiple tealight holders, vitamins, facial cream, and a book. Security personnel in the store stopped Satterfield and her male companion, who also pulled off a smaller slide of his own, as they left the store. Doc. 77-2 at 12–13. The total value of the items Satterfield took was $231.20. Satterfield, her male companion, and her daughter were all arrested and brought to the Licking County Jail. Satterfield signed a statement in which she admitted to the theft. She was placed by the court in a diversion program, which she successfully completed, resulting in the charges against her being dropped. Doc. 54-1 at 1–2; Deposition of Michelle Satterfield, Vol. I, at 197–99.

Satterfield did not report this arrest immediately to the Sheriff's Office, but an anonymous individual took care of that within a few weeks. Using block letters on the envelope to prevent his or her identity from being revealed, the individual sent Major Herrell copies of court records and the police report from Satterfield's case, writing "County Nurse" on the first of these pages to make sure Major Herrell made the connection. Doc. 54 at 3–14. Major Herrell passed these documents along to individuals at Internal Affairs, who corroborated the information in the anonymous letter. An investigation into the matter was authorized, and Lieutenant Michael Flynn concluded as a result of this investigation that Satterfield had, indeed, been arrested for and admitted to the theft from Meijer on January 14, 2007, but she did not notify the Sheriff's Office of the arrest. His recommendations were that charges for failure to obey laws and ordinances; violation of rules,

9

regulations, or directives; failure to report arrest or court actions; and unbecoming conduct be sustained against Satterfield. He also recommended that a charge of cause for suspension or dismissal be sustained against Satterfield for these violations.  Doc. 54-1 at 1–3.

Satterfield was ultimately terminated for these actions, but there is one additional aspect of the termination process that deserves mention. When Satterfield was terminated on April 4, 2007, the memorandum she received informing her of this decision listed charges for sick leave abuse along with the charges related to her arrest as the reasons for her termination. Doc. 48-1 at 5–7. Satterfield filed a grievance the very next day in which she alleged to have been terminated without just cause and to have been the victim of disparate treatment. Doc. 49 at 1. This grievance was rejected by Pat Garrity, the Director of Management Services for the Office, on April 18, 2007; however, Garrity did recognize that the charge for sick leave abuse should not have been included as a basis for her termination—in his review of her payroll records he found that she did not abuse her sick leave. He therefore stated that her notice of removal would be altered to remove the sick leave abuse charge as a basis for her termination. Doc. 49 at 3–4. Sheriff Karnes concurred in this alteration. Doc. 49 at 5. A second termination memorandum was then given to Satterfield, although it was still dated April 4, 2007. This time, the reasons for her termination did not include the charges related to sick leave abuse. Id. at 6.

Satterfield filed a timely charge with the Equal Employment Opportunity Commission, and she received notice of her right to sue on February 5, 2008. Doc. 2-1, Exhibit A. She filed this lawsuit on April 23, 2008. Counts One and Two are for sexual harassment in violation of OHIO REV. CODE § 4112 and Title VII of the Civil Rights Act of 1964, respectively. Counts Three and Four are for retaliation in violation of § 4112 and Title VII, respectively. Count Five is a common law claim

10

for intentional infliction of emotional distress. She seeks a declaratory judgment on each of these counts, reinstatement, expungement, $25,000 in compensatory damages, and more than $25,000 in punitive damages, costs, and attorneys' fees. The Sheriff has filed a motion for summary judgment.

## II. Applicable Law

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

11

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that

12

"there is a genuine issue for trial," and  "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418,

422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

 The existence of a mere scintilla of evidence in support of the opposing party's position is

insufficient; there must be evidence on which the jury could reasonably find for the opposing party.

Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to

demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v.

Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter

summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the

nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy,

Inc., 39 F.3d at 1347.

**III. Discussion**

For the purposes of the following analysis, Satterfield's first four claims can be divided into

two groups: the hostile work environment claims and the retaliation claims. The fifth

claim—intentional infliction of emotional distress—fits into neither category, but is still based on

many of the same facts. Before beginning this analysis, however, the Court notes that after the

motion for summary judgment was filed, Satterfield filed an amended complaint in which she

changed the identity of the defendant from the Franklin County Sheriff's Office to Sheriff James A.

Karnes, in both his individual and official capacities. The Sheriff has addressed this change in his

13

reply brief with arguments regarding state-law immunity for claims against employees of political subdivisions in their individual capacities, and the Court requested a supplemental brief in opposition from Satterfield, along with a reply from the Sheriff. The Court will therefore consider the parties' arguments regarding the Sheriff's immunity to claims against him in his individual capacity first, followed by the hostile work environment claims, the retaliation claims, and the emotional distress claim.

### A. Immunity

The Sheriff argues that he is shielded from liability in his individual capacity due to immunity granted under Ohio law. In addition, with respect to the two claims made under Title VII, he correctly argues that Title VII does not provide for individual liability, and Satterfield agrees. Reply at 23 (citing Wathen v. General Electric Co., 115 F.3d 400 (6th Cir. 1997)); Plaintiff's Supplemental Memorandum in Opposition at 1.

As for the two state law claims—harassment and retaliation—and the claim for intentional infliction of emotional distress, the Sheriff argues that he is protected by state-law immunity conferred in § 2744.03(A)(6) of the Ohio Revised Code, which provides that:

> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that

> section imposes a responsibility or mandatory duty upon an
> employee, because that section provides for a criminal penalty,
> because of a general authorization in that section that an employee
> may sue and be sued, or because the section uses the term "shall" in
> a provision pertaining to an employee.

He argues that neither Satterfield's Amended Complaint nor her Brief in Opposition to the Motion for Summary Judgment has pointed to any facts that would trigger any of the three exceptions to § 2744.03(A)(6). Specifically, he argues that the Sheriff was responsible for making decisions regarding personnel matters, thereby negating any claim that the Sheriff was acting "manifestly outside the scope of [his] employment or official responsibilities" under § 2744.03(A)(6)(a). He also argues that § 2744.03(A)(6)(b) cannot apply because there is no evidence to establish that the Sheriff acted "with [a] malicious purpose, in bad faith, or in a wanton or reckless manner." The evidence showing a relationship between the Sheriff and Major Mann, he says, only establishes that they knew each other about as well as any coworkers would after working together for thirty years. He also argues that § 2744.03(A)(6)(c) cannot withdraw immunity from the Sheriff, because there is no statute that "expressly impose[s] liability upon the employee." And lastly, the Sheriff claims that summary judgment is appropriate on Satterfield's claim for punitive damages, because no evidence can show that he acted with actual malice, as is required for such a claim.

Satterfield responds on several fronts, though she does not challenge the Sheriff's claims that § 2744.03(A)(6)(a) does not apply and that summary judgment is appropriate on her claim for punitive damages. Instead, she focuses her arguments on the applicability of §§ 2744.03(A)(6)(b) and (c); she claims that a genuine issue of material fact exists on the question of whether the Sheriff acted "in bad faith, or in a wanton or reckless manner" on the harassment, retaliation, and intentional infliction of emotional distress claims, and also that liability is "expressly imposed," under

15

§ 2744.03(A)(6)(c), upon the Sheriff for harassment and retaliation. Satterfield also argues that immunity is lifted on the harassment, retaliation, and emotional distress claims by the global exception to immunity found in OHIO REV. CODE § 2744.09(B), which provides that the entire chapter 2744, Political Subdivision Tort Liability, does not apply to "civil actions by an employee . . . against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision."

In considering these arguments, the Court is bound by the law and decisions of the state of Ohio. 28 U.S.C. § 1652; see also C & H Entertainment, Inc. v. Jefferson County Fiscal Court, 169 F.3d 1023, 1025 (6th Cir. 1999). Where the Ohio Supreme Court has not addressed an issue, the decisions of the intermediate appellate courts "are accorded weight," but are not binding if the federal court is "convinced by other data that the state's highest court would determine otherwise." Bailey v. V & O Press Co., Inc., 770 F.2d 601, 604 (6th Cir. 1985); see also Ellis ex rel. Pendergrass v. Cleveland Municipal School Dist., 455 F.3d 690, 698 (6th Cir. 2006) ("Because 'the state's highest court has not decided the applicable law, then [this] court must ascertain the state law from 'all relevant data,'' including the state's intermediate court decisions.") (citations omitted; alteration in original). Other "relevant data" includes "the state's supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states." Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126, 1130 (6th Cir. 1995).

For the reasons that follow, the Court holds that the Sheriff is not entitled to immunity in his individual capacity on the state-law claims of harassment and retaliation, but he is entitled to such immunity on the intentional infliction of emotional distress claim. Additionally, Satterfield has waived any arguments in favor of a punitive damages claim against the Sheriff.

16

**1. The Sheriff is Not Entitled to Immunity on Satterfield's Harassment and Retaliation Claims.**

Satterfield argues that § 2744.03(A)(6)(c), which withdraws immunity whenever "Civil liability is expressly imposed upon the employee by a section of the Revised Code," applies because liability is so imposed upon the Sheriff under § 4112 of the Ohio Revised Code. Her harassment and retaliation claims here are brought under § 4112.02, which provides that:

> It shall be an unlawful discriminatory practice:
>
> > (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
> >
> > * * *
> >
> > (I) For any person to discriminate in any manner against any other person because that person has . . . made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

OHIO REV. CODE § 4112.02. As is apparent from the text, civil liability is not imposed directly on an employee of a political subdivision through these sections. Instead, it is imposed later, in OHIO REV. CODE § 4112.99: "Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."

Satterfield's argument is based on the fact that the Ohio Supreme Court has directly held that supervisors and managerial employees may be held liable for violations of Chapter 4112. Genaro v. Cent. Transp. Inc., 84 Ohio St. 3d 293, 293 (Ohio 1999). In Genaro, the Court answered a certified question from the United States District Court for the Northern District of Ohio, and its conclusion that managerial and supervisory employees may be held liable was based on the fact that

17

the definition of "employers" in OHIO REV. CODE § 4112.01(A)(2) included "any person acting directly or indirectly in the interest of an employer." The opinion is somewhat unclear as to why only supervisors and managers may be held liable when the definition of "employer" would appear to apply equally to all employees. See Genaro, 84 Ohio St. 3d at 303–04 (Cook, J., dissenting). Furthermore, the court's analysis was focused almost entirely on § 4112.02(A)'s use of the term "employer," yet from this the court concluded broadly that managers and supervisors may be liable under all of Chapter 4112, not simply § 4112.02(A). Nonetheless, the court's holding is clear: "For purposes of R.C. Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112." Id. at 293.

In addition, several appellate courts in Ohio have held that employees of political subdivisions do not have immunity from suits under § 4112 because liability is "expressly imposed" upon those employees, thereby causing the § 2744.03(A)(6)(c) exception to immunity to apply. See Conroy v. Williams, 185 Ohio App. 3d 69, 77 (Ohio Ct. App. 2009) (citing Genaro); Albert v. Trumbull Cty. Bd. of Mental Retardation/Developmental Disabilities, 1999 WL 957066, *5 (Ohio Ct. App. 1999) (unpublished opinion); Hall v. Mem. Hosp. of Union City, 2006-Ohio-4552, ¶ 15 (Ohio Ct. App. 2006) (citing Genaro). The Sheriff responds to these three cases, however, with one of his own. In Campolieti v. City of Cleveland, 184 Ohio App. 3d 419 (Ohio Ct. App. 2009), the Eighth District held that OHIO REV. CODE § 2744.03(A)(6)(c) still protects employees of political subdivisions from lawsuits under Chapter 4112. There otherwise appears to be very little case law in Ohio on the question of whether immunity is removed from employees of political subdivisions for claims of discrimination through § 2744.03(A)(6)(c). The Court believes that at the time this

18

Memorandum Opinion and Order is issued, the weight of authority in Ohio appears to support Satterfield's position.

Starting with Albert v. Trumbull County Board, 1999 WL 957066 (Ohio Ct. App. 1999), it is true, as the Sheriff points out, that the Eleventh District was not directly focused, in this case, on whether individual employees were immune to suits brought under Chapter 4112. But the basic reasoning used by the court in Albert has been cited in cases since then in other appellate districts, so it is worth considering. In Albert, the plaintiff sued a government agency under OHIO REV. CODE § 4112.02(B)(1), which prohibits discrimination by employment agencies, and the central issue on which the court focused was whether the defendant met the definition of "employment agency"—i.e., whether it had been a "person regularly undertaking, with or without compensation, to procure opportunities to work or to procure, recruit, refer, or place employees." See OHIO REV. CODE § 4112.01(A)(5). Before reaching this issue, however, the court addressed the plaintiff's argument that § 2744.03(A)(6)(c) withdrew the defendant's § 2744.03 immunity because another statute, § 4112.02(B)(1), expressly imposed liability on employment agencies and its employees. The plaintiff argued that it did so, because the defendant agency and its employees constituted "persons," who functioned as an "employment agency." The court agreed "[a]s a general matter" that the agency and its employees can be liable "for discriminatory practices pursuant to various provisions within R.C. Chapter 4112." Albert, 1999 WL 957066 at *5. It then agreed that an agency and its employees could be held liable under the specific provision of Chapter 4112 at issue in that case, § 4112.02(B)(1), because they fit the definition of "persons." Id. As mentioned, however, the court ultimately took issue with the claim that the defendants in that case met the remaining requirements of the definition of an "employment agency"—i.e., whether it had been a person

19

"regularly undertaking, with or without compensation, to procure opportunities to work or to procure, recruit, refer, or place employees." Id. (citing OHIO REV. CODE § 4112.01(A)(5)). Thus, although not focused directly on the provisions at issue here, §§ 2744.03(A)(6)(c) and 4112.02(A) and (I), the opinion's reasoning can be read to support the proposition that so long as an employee of a political subdivision is included within the definition of a person on whom civil liability is expressly imposed, that employee is not protected by the immunity of § 2744.03.

Albert was cited by the Seventh District in Conroy v. Williams, 185 Ohio App. 3d 69, 77 (Ohio Ct. App. 2009). That court dealt specifically with one of the provisions of § 4112 at issue here—the provision on employment harassment, § 4112.02(A). In Conroy, the court squarely held that § 2744.03(A)(6)(c) withdrew immunity from a former city employee facing a claim for violating § 4112.02(A). 185 Ohio App. 3d at 77. Its reasoning was based on the fact that the Ohio Supreme Court had found in Genaro that managerial and supervisory employees of political subdivisions fall within the definition of "employer," and can therefore be liable under § 4112.02(A). Id. (citing 84 Ohio St. 3d at 293). The Third District held similarly in Hall, 2006-Ohio-4552, at ¶ 15. As with the Conroy court, its reasoning was that because Genaro held that employees of political subdivisions can be held liable under § 4112.02, they are "not entitled to sovereign immunity as to" allegations of discrimination. Hall, 2006-Ohio-4552 at ¶ 15.

In Campoleiti,184 Ohio App. 3d 69 (Ohio Ct. App. 2009), however, the Eighth District engaged in analysis of this issue that was similar in its brevity, but which reached the opposite conclusion. It found that employees of political subdivisions are immune from suits under a different statute from the two at issue here, § 4112.14, which prohibits employers from engaging in age discrimination, simply because that provision "speaks in terms of 'employers.'" Campolieti, 184

20

Ohio App. 3d at 430. Yet there are several reasons why Campoleiti is arguably distinguishable. First, it is notable that although the court found it important that § 4112.14 "speaks in terms of 'employers,'" it did not mention the definition of "employer" found in § 4112.01(A)(2). Second, and perhaps related to its failure to mention the definition of employer, the Campoleiti court also failed to mention the Ohio Supreme Court's holding in Genaro, which, as mentioned, made it quite clear that employees of political subdivisions can be held liable for violations of Chapter 4112.

Notwithstanding this, the Court notes that an argument can be made that § 2744.03(A)(6)(c)'s requirement that liability be "expressly" imposed upon an employee "by a section of the Revised Code" means that some statutes necessarily do not impose liability "expressly" enough to withdraw immunity from the employee, and that this may be the case for claimed violations of OHIO REV. CODE §§ 4112.02(A) and (I) by employees of political subdivisions. After all, neither provision expressly mentions employees, and it took the Genaro decision of the Ohio Supreme Court to clarify that employees can be liable under Chapter 4112. Although it is conceivable that the Ohio Supreme Court could hold that Genaro-based liability in § 4112 is not what the Ohio legislature had in mind when it required that liability be "expressly imposed upon the employee by a section of the Revised Code" in order for immunity to be withdrawn, there does not appear to be any clear "data" to make this Court believe that the Ohio Supreme Court would so hold.

The Court therefore believes that the cases cited by Satterfield on this point are the best evidence of how the Ohio Supreme Court would rule regarding the immunity of employees of political subdivisions under § 2744.03(A)(6)(c) for claims brought under § 4112.02. This is certainly true with respect to Satterfield's claim for harassment, as § 4112.02(A) was expressly contemplated

in Hall and Conroy. And it is also true with respect to Satterfield's retaliation claim. As mentioned above, § 4112.02(I) imposes liability on any "person" who retaliates. Looking to the definition of "person," it expressly includes employees. OHIO REV. CODE § 4112.01(A)(1) ("'Person' includes . . . but is not limited to, any . . . employee . . . ."). Thus, under Ohio law, § 2744.03(A)(6)(c) operates to withdraw immunity from the Sheriff for both the harassment and the retaliation claims, because §§ 4112.02(A) and (I) "expressly impose[]" liability upon the Sheriff for such actions.

## 2. The Sheriff is Entitled to Immunity on Satterfield's Claim for Intentional Infliction of Emotional Distress.

Satterfield makes two basic arguments in favor of withdrawing immunity from the Sheriff for her claim of intentional infliction of emotional distress. First, she argues that OHIO REV. CODE § 2744.09 withdraws immunity from employees of all political subdivisions for claims arising out of their employment relationship. As mentioned earlier, § 2744.09(B) provides that the entire chapter providing immunity to employees of political subdivisions does not apply to "Civil actions by an employee . . . against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision." Second, Satterfield argues that immunity is withdrawn from the Sheriff through § 2744.03(A)(6)(b), which provides that an employee is not entitled to immunity when that "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

In support of her first argument, Satterfield cites some cases in which Ohio appellate courts have held that § 2744.09(B) withdraws immunity from employees of political subdivisions who are named as defendants in employment suits, as contrasted with the immunity of political subdivisions that are named as defendants in employment suits. Plaintiff's Supplemental Opposition to Defendant's Motion for Summary Judgment at 9–10 (citing Zumwalde v. Madeira & Indian Hill

22

Joint Fire District, 2009-Ohio-6801 (Ohio Ct. App. 2009) and Nagel v. Horner, 162 Ohio App. 3d 221 (Ohio Ct. App. 2005)). In Zumwalde, the First District reasoned that the legislature, in § 2744.09(B), must have intended to withdraw immunity from employees in suits arising out of an employment relationship with a political subdivision, because the immunity of employees of political subdivisions is entirely derivative of and dependent on the fact that they are employed by a political subdivisions. 2009-Ohio-6801 at ¶ 9. Therefore, the reasoning goes, when the legislature removes immunity from the political subdivision, it would not make sense to permit an employee of a political subdivision to retain that immunity. Id. Nagel, however, mentions the issue only in dictum, and does not distinguish between the immunity of political subdivisions and its employees. 162 Ohio App. 3d 221, ¶ 14.

The Sheriff again cites Campolieti in support of the opposite conclusion. In Campolieti, the Eighth District, in passing, rejected the argument that § 2744.09(B) permits suits against an employee of a political subdivision. Specifically, it relied upon the fact that this section only mentions "political subdivisions," not employees. Campolieti, 184 Ohio App. 3d at 430. And in addition to the support provided by Campolieti, the Sheriff points to the text of the provision immediately preceding § 2744.09(B): § 2744.09(A) withdraws immunity in "Civil actions that seek to recover damages from a political subdivision or any of its employees for contractual liability." OHIO REV. CODE § 2744.09(A) (emphasis added). This, he argues, shows that the Ohio legislature was well aware of how to withdraw the immunity of both political subdivisions and employees at the same time. Had the legislature intended to include employees in § 2744.09(B), it would have done so.

The Court agrees with the Sheriff's interpretation. The text of § 2744.09(B) is quite clear that political subdivisions are the entities from which immunity is removed in employment suits. The section deals <u>only</u> with civil actions "by an employee . . . <u>against his political subdivision</u> . . . ." OHIO REV. CODE § 2744.09(B) (emphasis added). There is simply no mention of actions against employees of a political subdivision in that section, despite the fact that § 2744.09(A) explicitly included employees along with political subdivisions when addressing suits arising out of contractual relationships. And where the text of a statute is clear and unambiguous, the Court should not read in additional requirements or interpretations that are not supported by that clear text. <u>Chrysler Corp. v. Comm'r</u>, 436 F.3d 644, 654 (6th Cir. 2006); <u>U.S. v. Boucher</u>, 236 F.3d 768, 774 (6th Cir. 2001). This is certainly true when the Ohio Supreme Court has not added any gloss onto § 2744.09(B), as it did, at least in the eyes of the Ohio appellate courts, for § 2744.03 in <u>Genaro</u>. Thus, § 2744.09(B) does not operate to withdraw immunity from the Sheriff for the claim against him in his individual capacity for intentional infliction of emotional distress.

Satterfield's second argument is that § 2744.03(A)(6)(b) also withdraws immunity from the Sheriff on her emotional distress claim; this provision withdraws immunity from employees of political subdivisions where "The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

> As another District Court in Ohio has summarized, with regard to the application of this provision, "'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified. 'Bad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another. 'Wanton misconduct' is the failure to exercise any care whatsoever." <u>Morrison v. Bd. of Trs.</u>, 529 F.Supp.2d 807, 835 (S.D.Ohio 2007) (citing <u>Cook v. Cincinnati</u>, 103 Ohio App.3d 80, 90–91 (Ohio Ct. App.1995)).

24

<u>Skovgard v. Pedro</u>, Slip Copy, 2010 WL 546368, at \*18 (S.D.Ohio Feb. 10, 2010). It is normally for a jury to determine whether an individual's actions meet any of these categories, but the standard is "high." <u>Fabrey v. McDonald Village Police Dep't</u>, 70 Ohio St. 3d 351, 356 (Ohio 1994). Nonetheless, summary judgment on this provision is appropriate where a court "conclude[s] that the record is devoid of evidence tending to show that the political subdivision employee acted wantonly or recklessly." <u>Irving v. Austin</u>, 138 Ohio App. 3d 552, 556 (Ohio Ct. App. 2000).

As the Sheriff correctly points out, there is absolutely no evidence in the record that establishes that the Sheriff actions were with malicious purpose, in bad faith, or in a wanton or reckless manner. Satterfield argues that the facts show that the Sheriff was "reckless in the way he handled or reacted to his crony's report that Ms. Satterfield, the victim, was partially to blame and should be held accountable." Supp. Opp. at 2. But reckless actions are those which are "done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent." <u>Caruso v. State</u>, 136 Ohio App. 3d 616, 621 (Ohio Ct. App. 2000). There is absolutely no evidence that would support a finding of reckless conduct on the part of the Sheriff, following Major Mann's unsuccessful efforts to influence the Sheriff. Indeed, Satterfield does not describe what the Sheriff did or did not do to meet the high standard of reckless conduct, choosing instead to rely on hyperbolic and unfounded allegations, such as "her fate had been determined when his crony begged the Sheriff to spare his son and laid blame on Ms. Satterfield." Supp. Opp. at 4.[1]

---

[1]

Satterfield's claim that the Sheriff "did not even investigate the circumstances surrounding Ms. Satterfield's arrest, her diversion, and the absence of a conviction," Supp. Opp. at 4, is not supported by the record. It is undisputed that the Sheriff had her arrest investigated, and that the Sheriff received the results of that investigation, which he considered personally when he decided to terminate her. Exhibit G, at 1–3; Karnes aff. at 1–2; Karnes depo. at 6–8, 13–17; Exhibit E at 30,

Furthermore, none of the cases cited by Satterfield can cure this absence of factual support in the record.

She also claims that "retaliating against a victim would . . . inflict serious emotional distress," Supp. Opp. at 4, but this allegation, absent evidence of retaliation, is hypothetical. Only if there were evidence that the Sheriff did, in fact, retaliate against her would immunity be withdrawn for the emotional distress claim. As will be explained below, the Sheriff is entitled to summary judgment on the merits of Satterfield's intentional infliction of emotional distress claim because the facts on the record simply do not permit a reasonable jury to find in Satterfield's favor. See Part III.D. Thus, the Sheriff is still protected by immunity for this claim against him in his individual capacity.

**3. Conclusion**

In sum, Satterfield's claims for harassment and retaliation, brought under Title VII in Counts Two and Four, respectively, are not viable against the Sheriff in his individual capacity. The Ohio law claims for harassment and retaliation, brought in Counts One and Three, respectively, are not barred by state-law immunity. Satterfield's claim for intentional infliction of emotional distress against the Sheriff in his individual capacity is blocked by immunity, and Satterfield has waived any claim that may have been brought against the Sheriff for punitive damages.

**B. The Hostile Work Environment Claims**

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Similarly, the Ohio Revised

---

33.

26

Code makes it unlawful "[f]or any employer, because of the . . . sex . . . of any person . . . to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." OHIO REV. CODE § 4112.02(A). Evaluation of these two claims is made easier, however, because Ohio courts have held that claims for hostile work environment brought under § 4112 are evaluated using the federal evidentiary standards and analysis used under Title VII. Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n, 61 Ohio St. 3d 607, 609 (Ohio 1991).

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the McDonnell Douglas framework set forth below, by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action. See Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). A facially discriminatory employment policy or an express statement by a decision-maker of a desire to terminate employees because they belong to a protected class would constitute direct evidence of discrimination. See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

Where the plaintiff has only circumstantial evidence of a discriminatory motive, however, claims are analyzed under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. The elements of a prima facie case vary somewhat, depending on the theory of

27

discrimination being asserted. If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. at 802–03. If the employer articulates such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination vel non." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000). The plaintiff must then prove by a preponderance of the evidence that the reason offered was pretextual. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason was insufficient to motivate the discharge. See Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994); Peters v. Lincoln Elec. Co., 285 F.3d 456, 471–72 (6th Cir. 2002). The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him. Burdine, 450 U.S. at 253.

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). To make a prima facie case of hostile work environment based on a co-worker's sexual harassment, a plaintiff must show that:

> (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action.

Fenton v. HiSAN, Inc., 174 F.3d 827, 829–30 (6th Cir. 1999). In Counts One and Two of her amended complaint, Satterfield alleges that she was "regularly and repeatedly subjected to

28

unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal and physical conduct of a sexual nature." Amended Complaint at ¶¶ 61, 69. The "type, frequency, and severity" of this behavior, she says, was "so severe and pervasive that it permeated the work environment and altered the terms and conditions of Plaintiff's employment;" "[n]o reasonable person should be expected to endure" that type of workplace environment. Id. at ¶¶ 62–63, 70–71. She also alleges that she complained of this behavior on numerous occasions, and that the Sheriff "failed to promptly investigate or mitigate [her] situation," resulting in Deputy Mann and his friends being able to continue harassing Satterfield. Id. at ¶¶ 64–65, 72–73. The Sheriff concedes that Satterfield can meet the first three elements of the hostile work environment test, but with respect to the fourth and fifth elements—whether the work environment was "severe or pervasive" and whether the Sheriff took "prompt and appropriate corrective action"—he argues that no evidence exists on which a reasonable jury could base a finding in Satterfield's favor.

**1. A Reasonable Jury Could Find that the Work Environment was Severe or Pervasive.**

The Supreme Court has made clear that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 65, 67). Furthermore, courts should look at the totality of the circumstances when considering whether harassment was so severe or pervasive that it created a hostile work environment. Id. at 23. Indeed, "courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility." Williams v. Gen. Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999). Factors relevant to this inquiry include:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 510 U.S. at 23. When undertaking this inquiry, the "real social impact" of the harassment in the workplace is what matters. Oncale v. Sundowner Offshore Services, 523 U.S. 75, 81–82 (1998). This "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id. at 82.

The inquiry also includes objective and subjective components; Satterfield must show both that the environment was so severe or pervasive that a reasonable observer would find it objectively hostile, and that she subjectively regarded it as abusive. Harris, 510 U.S. at 21–22. Moreover, "the conduct underlying a sexual harassment claim need not be overtly sexual in nature. Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII." Williams, 187 F.3d at 565 (emphasis in original).

There are two main fronts to the Sheriff's argument that the harassment was not severe or pervasive: he argues first that some of Mann's actions should not be part of the inquiry as a matter of law, and second, that others, although relevant, are insufficient to establish that the environment was severe or pervasive. On the first front, the Sheriff argues that the obscene phone call in which Mann attempted to convince Satterfield to go to a hotel with him should not be considered by the Court because Mann was not Satterfield's supervisor and because it occurred after hours and outside the workplace. Motion at 15. The parties agree, however, that the Sixth Circuit has not yet taken a

position on whether off-premises, after-hours conduct by a non-supervisory employee may be considered by a Court as part of its analysis. See Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 335 (6th Cir. 2008) (citing Duggins v. Steak 'N Shake, Inc., 3 Fed. App'x 302, 311 (6th Cir. 2001)); see also Motion at 15; Opposition at 19. And although courts outside this circuit have held that an employer is not liable for harassment by a non-supervisor that occurs outside of work, "when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the work environment to be hostile." Duggins, 3 Fed. App'x at 311. With this Sixth Circuit opinion, albeit unpublished, and absent any contrary Sixth Circuit law preventing the Court from considering the obscene phone call from Mann to Satterfield, the Court will not ignore the "real social impact" of this phone call on Satterfield's work environment, especially when considered as part of the totality of the circumstances.

As for Mann's phone call to Satterfield on October 3, 2006, after the two incidents, in which he allegedly asked her why a supervisor was telling him not to talk to her, the Sheriff argues that this should not be considered because it is not sexual in nature. Motion at 15. He makes the same argument with respect to Mann's December 8, 2006 "don't look at me" comment to Satterfield, citing the statement in Onacle that a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" Id. (citing Oncale, 523 U.S. at 80 (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis and alteration in original)). This statement from Oncale, however, does not stand for the proposition that comments devoid of any overt reference to sex should not be considered part of a severe or pervasive work environment; it merely recognizes that when a court considers comments that may be "tinged with offensive sexual connotations," it must remain focused on the ultimate question of

whether such statements are "discrimina[tion] . . . because of . . . sex," as opposed to whether comments are offensive. Instead, when it comes to comments that are not sexual in nature, they could be viewed, in the totality of the circumstances, as behavior that contributes to a hostile work environment. Williams, 187 F.3d at 563–65 (citing Oncale, 523 U.S. at 82). "[H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." Id. at 565. The Court need not decide, however, whether these two comments—asking, on the night of the assaults, why a supervisor was telling him not to contact Satterfield, and telling Satterfield "don't look at me" on December 8—were motivated by discriminatory animus toward women; even if these comments are disregarded, the Court believes that the other actions complained of are sufficient to establish a severe or pervasive work environment.

On the second front, the Sheriff argues that Mann's assaults on the night of October 3 and his prior actions toward Nurse Randle are insufficient to permit a jury to find a hostile work environment. As for the assaults, he cites three cases in which sexually explicit conduct that was, to a minor degree, physical, was ultimately held not to constitute a severe or pervasive hostile work environment. Motion at 15–16 (citing Burnett v. Tyco, Corp., 203 F.3d 980, 981 (6th Cir. 2000); Clark v. United Parcel Service, Inc., 400 F.3d 341, 347–48 (6th Cir. 2005); and Stacy v. Shoney's, Inc., 142 F.3d 436 (Table), 1998 WL 165139 (6th Cir. 1998) (unpublished decision)). These cases, however, are only used as persuasive examples, not as binding authority, and the Court believes that none involved conduct as serious as that involved here. In Burnett, the only physical contact was the harasser placing a pack of cigarettes inside the victim's tank top; the remainder of the conduct consisted of sexual comments. 203 F.3d at 981. In Clark, the only physical contact was the harasser

32

twice placing a vibrating pager against the victim's thigh and, on a separate occasion, pulling at the victim's overalls in an attempt to see her underwear. 400 F.3d at 345. And in <u>Stacy</u>, the only physical contact was the harasser inappropriately touching the victim's breast as he removed and then replaced a pen from her front shirt pocket. 1998 WL 165139 at *1. Needless to say, whatever the sexual comments were in these cases, the inappropriate physical actions alleged were a far cry from those involved here. In this case, Mann forcibly grabbed Satterfield's breast and reached for her crotch on one occasion, and when that attack was repelled, he returned later that night and forcibly kissed her, with his hand at her head. These examples are, as a result, not persuasive.

As for the alleged harassment of Randle, the Sheriff notes that the Sixth Circuit does permit a jury to consider similar acts of harassment of which a plaintiff becomes aware during the course of her employment. Motion at 16 (citing <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 336 (6th Cir. 2008)). Several factors affect the weight to be given to these acts: "the severity and prevalence of the similar acts of harassment, whether the similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff." <u>Hawkins</u>, 517 F.3d at 336. The Sheriff argues that Mann's actions toward Randle—repeatedly asking her out on dates and making sexual comments to her—are not similar to the conduct faced by Satterfield and occurred long before the harassment of Satterfield. He also points out that Satterfield did not hear of the harassment of Randle directly from Randle and did not know the details of the harassment. Motion at 17. This argument, however, goes more to the weight to be given to these similar acts. And the <u>Hawkins</u> court made clear that "[t]he degree to which a past act of harassment is relevant to the determination of whether a plaintiff's work environment is hostile is a fact-specific inquiry that requires courts to determine the relevancy of past acts on a

33

case-by-case basis." Id. at 336–37. As a result, the sole objective of the Court, with respect to Mann's actions toward both Randle and Satterfield, is to determine whether there is sufficient evidence in the record to permit a reasonable jury to find that Satterfield's work environment was severe or pervasive. In this inquiry, it must take into account the factors to be used to determine whether the conduct is severe or pervasive, as well as the law just mentioned outlining the relevance of similar acts of harassment of others.

With all of this in mind, the Court believes that evidence does exist in the record on which a reasonable jury could base a finding that Mann's sexual harassment of women did create a hostile work environment that was severe or pervasive. The Sheriff's arguments attempt to dilute the overall "real social impact" of Mann's actions by discussing only whether each separate incident, in isolation, is sufficient to constitute a severe or pervasive work environment. The issue, however, "is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." Williams, 187 F.3d at 562 (emphasis in original). See also Betts v. Costco Wholesale Corp., 558 F.3d 461, 468–69 (6th Cir. 2009). Here, a jury could conclude that the harassing phone call and the two physical sexual assaults on Satterfield, taken together and viewed in the totality of the circumstances, were sufficiently severe or pervasive to find that Mann created a hostile work environment.

As for the objective component of the inquiry, a reasonable jury could find the work environment to have been objectively hostile. See Harris, 510 U.S. at 21–22. The harassment did not consist of one, isolated incident; rather, it consisted of several incidents over the course of several months. Additionally, this circuit has recognized that an "element of physical invasion" is

34

more significant than mere harassing comments. Hawkins, 517 F.3d at 334. Indeed, in Williams, this Court found a triable issue of fact where offensive comments made by the alleged harasser were accompanied by an element of physical invasion that was much less than that involved here. The alleged harasser had put his arm around the plaintiff's neck and pressed his face up against hers as he made crude comments. Williams, 187 F.3d at 563. Here, Satterfield was the victim of two incidents on the same night in which Mann forcibly grabbed her breast and kissed her and she had to push him away. This came after the harassing phone call in which Mann asked obscene questions and tried to get Satterfield to go to a hotel with him. Indeed, the degree of the physical invasion here was so severe that even if the obscene phone call were not to be considered by this Court because it occurred after work-hours and away from the workplace, the assaults on October 3 are, on their own, sufficient to permit a reasonable jury to find that the work environment was objectively severe or pervasive enough to constitute a hostile work environment.

The same is true for the subjective component of the inquiry. There is no doubt that a reasonable jury could find that Satterfield perceived her work environment to be hostile. After complaining of the grabbing and kissing incident, she felt like she was being ignored. Satterfield depo. at 309–10. Although she was asked if she would like to transfer to another shift or another facility, she was not able to accept that invitation because she had two other jobs at the time and could not afford to make that change. Id. at 309–12. So, instead, she continued to work her same shift at the Jackson Pike facility. Id. at 311–12. As a result, in the time after the assault, Satterfield was constantly afraid of more harassment from Mann. As she said in her response to the Sheriff's interrogatories:

> After I had reported in [October] that Deputy Mann and myself continued to work in the same building, he continued being assigned at the North Booking desk. I was always afraid of running into him on the elevator or in the stairwell, even in the hall. Every time the elevator or stairwell door would open I was looking to see who it was because my post was near both. There was nothing done to separate us which allowed him to accost me as described in my complaint. It was in December when I wrote out my second complaint. Deputy Mann was then put in the Control Center to work where he could watch me.

Doc. 50-1 at 3.

Mann's "don't look at me" comment in December was also perceived by Satterfield to be harassing. He made this comment "with two other deputies," who started chuckling, "and it was condescending and it was harassment the way he said it." Satterfield depo. at 328. Satterfield also stated that she was subjected to "dirty looks" and told there was a "haters club" against her resulting from her complaints about Mann. Satterfield depo. at 318–19, 332. And perhaps most tellingly, when asked in her November 15, 2006 interview with Internal Affairs whether she would be able to work with Mann if he was assigned to her as an escort as she passes out medication to inmates, her response was clear: "I wouldn't want to, no." Satterfield depo. at 44.

There is therefore ample evidence in the record on which a reasonable jury could base a finding that, in the totality of the circumstances, the harassment in Satterfield's work environment was so severe or pervasive as to constitute a hostile work environment, both objectively and subjectively. Indeed, one result of the thorough investigation by the Sheriff's Office was a finding that Mann created a hostile working environment for Satterfield.

36

**2. No Reasonable Jury Could Find That the Sheriff's Actions Were Not "Prompt and Appropriate."**

"Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action." Hawkins, 517 F.3d at 338 (citing E.E.O.C. v. Harbert-Yeargin, Inc., 266 F.3d 498, 518 (6th Cir. 2001)). "[A] company may be held liable for coworker harassment if its 'response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" Id. (quoting Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 873 (6th Cir. 1997)). "[A] response is generally adequate . . . if it is 'reasonably calculated to end the harassment.'" Id. at 340 (quoting Jackson v. Quanex Corp., 191 F.3d 647, 663–64 (6th Cir. 1999)). And whether a response is effective is "measured not by the extent to which the employer disciplines or punishes the alleged harasser, but rather if the steps taken by the defendant halt the harassment." Stacy v. Shoney's, Inc., 955 F. Supp. 751, 756 (E.D.Ky. 1997), aff'd 142 F.3d 436 (6th Cir. 1998). Furthermore, "[a]n employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past." Hawkins, 517 F.3d at 341. That said, it is not an ironclad rule that an employer must separate the alleged harasser and the plaintiff at all times. Mullins v. Goodyear Tire & Rubber Co., 291 F. App'x 744, 750 (6th Cir. 2008) (unpublished opinion). Evaluation of the response is a fact-specific inquiry and must be done on a case-by-case basis. Rabidue v. Osceola Refining Co. Div. of Texas-American Petrochemicals, Inc., 805 F.2d 611, 621 (6th Cir. 1986), abrogated on other grounds by Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993).

The Sheriff argues that a reasonable jury could not find that the Sheriff failed to take "prompt and appropriate corrective action." Motion at 17. In doing so, he points to the many actions that the parties agree were taken in response to Satterfield's complaint about the October 3 assaults. Many of these were actually taken by several of the Sheriff's top officials, and "[a]n employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management." Gallagher v. C.H. Robinson, 567 F.3d 263, 277 (6th Cir. 2009). And here, the Sheriff authorized his top officials to be part of the process. In the Franklin County Sheriff's Office, managers who receive complaints of harassment were required to report them up the chain of command. Barrett depo. at 9. The Sheriff also had in place an official policy that prohibited sexual harassment and required that complaints of such harassment be made to the Office's Equal Employment Opportunity Officer. Doc. 55-4 at 9. Should the complainant believe that this Officer could not impartially investigate the complaint, the policy provided for complaints to be made to the Ohio Civil Rights Commission or the United States Equal Employment Opportunity Commission. Id. Furthermore, "Reports of violations should be made in writing. Violations of this policy will be promptly investigated in an impartial manner." Id.

There is no dispute that Satterfield reported the allegation to a supervisor, Lieutenant Edgington, and that she made a written report to the Equal Employment Opportunity Officer, Lieutenant Cotner, who promptly opened an investigation. It also cannot be said that the overall length of the investigation—over four months—was too great. Lieutenant Cotner stated that this is the average length of time for an investigation, given the need to coordinate the schedules of all the individuals to be interviewed and the potential for unforeseen events to delay the investigation.

38

Affidavit of Lieutenant Karen Cotner at ¶¶ 10–11. Moreover, there can be no doubt as to the correctness of the ultimate disposition of this matter. At the conclusion of the thorough investigation, Lieutenant Cotner's report on the investigation recommended that Mann be suspended or fired. Doc. 55 at 29. And at the time Mann resigned, the Sheriff was going to fire him. Karnes depo. at 28.

The record shows that the Sheriff entrusted interim actions to several of his top officials, including Chief Deputy Barrett and Lieutenant Edgington. For example, the record shows that after Satterfield called Sergeant Tucker on October 3, the night of the physical assault, Tucker told her of the options she had to report the attack and followed up with her to make sure that she had done so. Motion at 18. And after Satterfield reported the attack to Lieutenant Edgington on October 7, Edgington did two things: he reported it to Lieutenant Cotner and sent an email to Mann's supervisors stating that Mann was to have no contact with Satterfield except insofar as was necessary for the performance of their job duties. Sergeant Josh Short conveyed these instructions to Mann, and on October 11, 2006, Chief Deputy Barrett issued a written order to Deputy Mann. His instructions to Mann were as follows:

> . . . you are hereby ordered to not have contact with or communicate, either verbally or in writing, with Nurse Satterfield unless such action is job-related. To the extent that any such contact and/or communications are necessary, you are to limit any such contact and/or communications to those that involve the dissemination of information that is necessary for the performance of your mutual job duties.

Doc. 55-2 at 34. This Stay Away Order was sufficient until Satterfield complaint about the "don't look at me" statement allegedly made by Mann during the "Code Blue" on December 8. After this, Mann was assigned to work in the Control Center. Viewing this evidence in the light most favorable to Satterfield, the Court believes that no reasonable jury could find that the Sheriff's actions and those of his top officials were not "prompt and appropriate" corrective actions, "reasonably

calculated to end the harassment." Hawkins, 517 F.3d at 340 (quotation marks omitted).

The responses to Satterfield's complaint were immediate and decisive. Mann was verbally ordered not to have any contact with Satterfield almost immediately by Sergeant Short, and the formal Stay Away Order was promptly issued by Chief Deputy Barrett. In fact, not only did they ensure that Mann was given orders not to have any contact with Satterfield, several of the Sheriff's officials believed that a criminal investigation was warranted. Chief Deputy Barrett wondered, as he forwarded Satterfield's complaint on to Chief Martin, "isn't this sexual imposition at a minimum & shouldn't this be treated as a criminal investigation, as well?" Doc. 55 at 21. Later on this same document, in another person's handwriting, is the following: "10-18-06 I.A.B. I concur with Chief Barrett? Could be criminal—contact victim & ask how she wants to proceed." Id. Satterfield, however, did not want criminal charges to be pursued, allegedly because she did not want to humiliate Mann's family and because she feared repercussions from other deputies. Satterfield depo. at 37–38. Satterfield's decision not to pursue criminal charges cannot, of course, be held against her. But it is obvious that the Sheriff's top officials took Satterfield's allegations seriously from the very beginning. Their undisputed responses clearly are not responses that "'manifest[] indifference or unreasonableness in light of the facts the employer knew or should have known.'" Hawkins, 517 F.3d at 338 (quoting Blankenship, 123 F.3d at 872–73).

Furthermore, there is no allegation that Mann violated the Stay Away Order in any way or had any contact with Satterfield whatsoever during the period between the October incidents and December. The Stay Away Order was clearly sufficient up until the December "don't look at me" comment. Although there is some dispute as to whether Mann did, in fact, say "don't look at me" during the December 8 "Code Blue," this innocuous comment, if accepted to have been made by

40

Mann, would not support a finding that the Stay Away Order was not "reasonably calculated to end the harassment." The Sheriff was entitled to believe that an order not to have contact with Satterfield would not be violated, and to the extent it possibly could even be argued that this innocuous comment, not sexual-in-nature, could somehow constitute a violation of the Stay Away Order, it was immediately remedied by assigning Mann to work in the Control Center, resulting in a complete physical separation of Mann and Satterfield during those occasions in which they were both working at the same time while the investigation was in progress.

With respect to the harassment of Randle, it is true that an employer's responsibility to prevent future harassment is greater when it is dealing with a known harasser. See Hawkins, 517 F.3d at 341. But the Sheriff did not become aware of this harassment until mid-November, over a month after the October incident. Once investigators learned, on November 15, of the allegations regarding Randle from Satterfield, who did not know of any of the details of that harassment, they interviewed Randle the very next day. In this interview, the investigators learned that Mann's alleged actions in the past, although clearly inappropriate, did not involve any physical contact. The Stay Away Order, however, was already in affect at the time the Sheriff learned of the Randle allegations, and the Sheriff cannot be said to have been indifferent or acted unreasonably in believing that the Stay Away Order was sufficient to end any harassment by Mann of Satterfield.

It must be remembered that Satterfield has the burden of not just establishing a hostile work environment, a burden easily carried under the facts of this case, but also the burden of establishing that the Sheriff or his top officials, aware of the alleged hostile work environment, "failed to take prompt and appropriate corrective action." Hawkins, 517 F.3d at 338. The undisputed facts are that the Sheriff and his top officials took this matter very seriously from the moment they first learned

41

of the complaint through to the end of the investigation, at which time the Sheriff decided to fire

Mann, and that strong actions were taken in the interim to protect against any further harassment of

Satterfield. These undisputed actions obviously did not "'manifest[] indifference or

unreasonableness in light of the facts the employer knew or should have known,'" Hawkins, 517

F.3d at 338 (quoting Blankenship, 123 F.3d at 872–73), and no reasonable jury could so find.

**3. Counts One and Two Do Not Survive Summary Judgment.**

For these reasons, summary judgment is appropriate on Counts One and Two. A reasonable

jury could find that Satterfield's work environment was severe or pervasive enough to be hostile,

but no reasonable jury could find that the Sheriff and his top officials failed to take prompt and

appropriate corrective action.

### C. The Retaliation Claims

Satterfield's next claims are for retaliation in violation of Title VII of the Civil Rights Act

of 1964 and OHIO REV. CODE § 4112.02(I). Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because he has opposed any practice made an unlawful
> employment practice by this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a). Similarly, the Ohio Revised Code provides that it shall be an "unlawful

discriminatory practice . . . (I) For any person to discriminate in any manner against any other person

because that person has . . . made a charge, testified, assisted, or participated in any manner in any

investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." OHIO

REV. CODE § 4112.02(I). As with the claims for hostile work environment, Ohio courts have held

that claims for retaliation brought under § 4112 are evaluated using the federal evidentiary standards

and analysis used under Title VII. <u>Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n</u>,

61 Ohio St. 3d 607, 609 (Ohio 1991). The Court will therefore consider both claims together. And

just as the hostile work environment claims were considered under the <u>McDonnell-Douglas</u> burden-

shifting standard, so are the claims for retaliation.

Satterfield alleges retaliation under two different theories. The first is that she was fired in

retaliation for filing her complaint of sexual harassment; the second is that she suffered retaliation

from her coworkers.

**1. Satterfield's Claim for Retaliatory Discharge**

To establish a prima facie case of retaliation, Satterfield must show that:

1) she engaged in activity protected by Title VII; 2) this exercise of protected rights
was known to defendant; 3) defendant thereafter took adverse employment action
against the plaintiff, or the plantiff was subjected to severe or pervasive retaliatory
harassment by a supervisor; and 4) there was a causal connection between the
protected activity and the adverse employment action or retaliation.

<u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted). If

Satterfield establishes this prima facie case, the burden of production shifts to the Sheriff to

"articulate some legitimate, nondiscriminatory reason" for his actions. <u>Id.</u> at 792–93 (quoting

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)). If the Sheriff produces such

evidence, then Satterfield, who bears the burden of persuasion throughout the entire process, must

demonstrate, "that the proferred reason was not the true reason for the employment decision." <u>Id.</u>

at 793 (quoting <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).

The Sheriff challenges Satterfield's ability to establish the fourth element of her prima facie

case: that there was a causal connection between the protected activity and the adverse employment

action or retaliation. He also argues that there is no evidence on which a reasonable jury could base

a finding that the Sheriff's legitimate, nondiscriminatory reason for his actions was merely a pretext.

As for the causal connection, without direct evidence of such a connection, "a plaintiff must produce sufficient evidence from which an interference could be drawn that the adverse action would not have been taken" in the absence of Satterfield's complaint of harassment. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). "[N]o one factor is dispositive in establishing a causal connection . . . ." Id. "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." Id.

One method of supporting this inference of causal connection is to point to the temporal proximity of the complaint to the retaliatory action. Id. at 566–67. There perhaps is some confusion within the Sixth Circuit as to whether temporal proximity alone may be enough to support an inference of a causal connection, but it suffices to say that in some circumstances—where only a small amount of time is at issue—temporal proximity may be enough.

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008). Another method is to point to evidence showing that similarly situated employees who had not complained of harassment were treated differently from the plaintiff. Nguyen, 229 F.3d at 563.

Here, Satterfield points to the temporal proximity between her complaint and her termination, but she also argues that she was treated differently than other employees who had committed acts of dishonesty. In particular, she points to two deputies who admitted to committing

44

acts of dishonesty but were not fired by the Sheriff. The first is Deputy Allison Engram, who admitted to misusing the computer system in the Sheriff's Office for non-law enforcement purposes. The second is Deputy Vonzell Powell, who was convicted of passing bad checks, cruelty to animals, and disorderly conduct. Neither was fired. This, she says, is dissimilar to the treatment she received after committing her own act of dishonesty—theft from Meijer—and gives rise to an inference that there was a causal connection between her complaint against Mann and her discharge.

The Sheriff correctly points out that claims of dissimilar treatment giving rise to an inference of a causal connection between a complaint and a retaliatory act require the existence of certain characteristics between those being compared. "The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) (quoting Ruth v. Children's Medical Center, 940 F.2d 662 (Table), 1991 WL 151158, at *6 (6th Cir. 1991).

> Thus, to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). That said, these factors are not an inflexible requirement. "Courts should not assume, however, that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). See also Jackson v. FedEx Corporate Services, Inc. 518 F.3d 388, 393–94 (6th Cir. 2008). The Sixth Circuit has also noted, in particular, that the "same supervisor"

45

requirement "does not automatically apply in every employment discrimination case. Whether that criterion is relevant depends upon the facts and circumstances of each individual case." McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005).

With respect to Deputies Engram and Powell, the Sheriff points out that they were not nurses, and were therefore in entirely different positions and subject to different supervision. Neither has easy access to prescription drugs in the course of his or her work. These facts, the Sheriff argues, establish that Deputies Engram and Powell are not proper bases of comparison to Satterfield. Instead, he says, two other former employees of the Sheriff's Office—Janet Whitt and Cassie Hines—are relevant examples. They were both nurses and both committed thefts during the course of their employment. Nurse Whitt stole medication from the Office, for which she was fired on July 10, 2007. And in November of 2007, Nurse Hines was also found to have stolen medication from the Sheriff's Office. Termination proceedings were initiated against Hines, as they were against Satterfield, but Hines resigned before their completion.

Given this uncontroverted evidence, the Court believes that Deputies Engram and Powell are not similarly situated employees, but Nurses Whitt and Hines are. They were in the same position as Satterfield, with the same type of supervision. They also had the same access to medications, thereby making personal integrity vital for the same reasons. Satterfield, however, argues that there is other evidence that shows a causal connection between Satterfield's complaint of harassment and her termination. This evidence focuses primarily on the process used by the Sheriff when considering whether to fire someone, combined with the knowledge the Sheriff had at the time he decided to fire Satterfield. As for the process, the Sheriff admits that he is the sole decision-maker when it comes to firing someone. Karnes depo. at 26–27. He takes into account the

46

summary of the Internal Affairs investigation and his own experience. Id. at 27. He does not have an absolute policy that employees convicted of a crime involving dishonesty must be terminated; rather, he bases his decision on the facts of each particular case. Karnes aff. at ¶ 3.

And as for his knowledge at the time of the decision, Major Mann has stated that he spoke to the Sheriff personally during the course of the investigation of his son. In this conversation, he "pleaded for [his son's] job with everything in [his] power." Mann, Sr. depo. at 13–14. He also told the Sheriff that he believed that "[i]t was a two-way street; that it had to be both parties involved." Id. at 14. In other words, that Satterfield must have done something to cause Mann to take the actions he did: "My part of it is that he had reason to believe that he could do that and it would be receptive—or she would be receptive." Id. at 15. Major Mann also stated that he didn't "recall the Sheriff ever telling [him] that [Satterfield] had been charged . . . until after . . . the investigation was over." Id. at 16. According to Major Mann, the Sheriff told him, most likely after the investigation of Satterfield was over, "that there were charges against her and that she would probably lose her job." Id. at 16. The Sheriff, for his part, does not recall speaking with Major Mann on this subject. Karnes depo. at 10, 29. Instead, in his affidavit, he states that he "did not consider the opinion of Major Alan Mann, Sr., his wife, or his daughter-in-law regarding the veracity of Ms. Satterfield's allegations regarding Alan Mann, jr.'s conduct. The fact that Alan Mann, Sr., has worked at the Sheriff's Office for 35 years played no role in my decision to terminate Ms. Satterfield." Karnes aff. at ¶ 7.

In addition, when Satterfield was finally terminated on April 4, 2007, the notice she received listed her alleged sick leave abuse as one of the reasons, along with the theft from Meijer and her failure to report her theft to the Sheriff's Office. As mentioned earlier, the charge of sick leave abuse

47

should not have been included among the reasons for Satterfield's termination. After Satterfield complained about this termination, the Sheriff's Office realized that she did not abuse her sick leave, and it therefore should not have been included among the reasons for her termination. As a result, the Sheriff's Office revised the April 4 termination letter it had given Satterfield, removing all reference to the charge of sick leave abuse.

Based on this evidence, and, importantly, considering it in the light most favorable to the plaintiff, it appears that a prima facie case of retaliation could be made, mainly due to the Sheriff's contact with Major Mann and the erroneous termination notice, but also due to the general temporal proximity between Satterfield's complaint and her termination. The burden now shifts to the Sheriff to articulate a legitimate, non-discriminatory reason for Satterfield's termination. Morris, 201 F.3d at 792 (6th Cir. 2000). The Sheriff easily meets this obligation, stating that Satterfield's theft from Meijer and her failure to report that theft to the Sheriff's Office were the legitimate, non-discriminatory reason. Reply at 15. The burden thus swings back to Satterfield to establish that this stated nondiscriminatory reason was merely a pretext for discrimination. Morris, 201 F.3d at 792–93. To establish pretext, Satterfield may prove "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original) (quoting McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir.1993)), abrogated on other grounds by Geiger v. Tower Automotive, 579 F.3d 614, 621 (6th Cir. 2009)). Satterfield argues that evidence exists which would permit a jury to find pretext under the second method—that the proffered reasons were not the actual reasons that motivated her discharge. Opp. at 36.

A plaintiff making a showing under this method:

admits the factual basis underlying the employer's proffered explanation and further admits that such conduct <u>could</u> motivate dismissal. . . . [Instead,] the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was <u>more</u> likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup.

<u>Manzer</u>, 29 F.3d at 1084 (emphasis in original; alteration added). Furthermore, "[i]t is not enough . . . to <u>dis</u> believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination." <u>Reeves v. Sanderson Plumbing Products</u>, 530 U.S. 133, 147 (2000) (emphasis in original) (quoting <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 519 (1993)). Thus, the question for this Court on summary judgment is whether there is evidence on which a reasonable jury could base a finding that it's more likely than not that Satterfield's firing was not solely based on her theft from Meijer and her failure to report this theft, and that, instead, it was based on discrimination. The Court believes that the evidence in the record is totally insufficient to permit such a finding by the jury; no reasonable jury could find that the Sheriff's reason was merely a pretext.

Although the investigation into Satterfield's unlawful conduct occurred at the same time as the investigation into Mann's alleged harassment, that fact is only the result of Satterfield's actions. The Sheriff was obligated to investigate her theft once he knew of it, and he was obligated to make a decision once the investigation was concluded. Insofar as Satterfield also argues that similarly situated individuals within the Sheriff's Office were treated more favorably despite similar offenses, she has failed as a matter of law to provide evidence of truly similarly situated individuals that were, in fact, treated more favorably. Deputies Engram and Powell, mentioned above, were not similarly situated. Instead, the only evidence in the record of similarly situated individuals is of Nurses Whitt

49

and Hines, one of whom was fired for her theft, and the other of whom was about to be fired for her theft when she voluntarily resigned. Furthermore, the fact that Satterfield had filed a complaint of harassment does not "indict the credibility" of the Sheriff's explanation. Instead, "the sheer weight of the circumstantial evidence" is simply insufficient to permit a reasonable jury to find that the Sheriff's explanation is a pretext or coverup. Summary judgment on this claim is therefore appropriate in favor of the Sheriff on this claim in both his individual and official capacities.

**2. Satterfield's Claims for Coworker Harassment**

Satterfield has also claimed retaliation in the form of coworker harassment. The Sixth Circuit has recognized claims for coworker harassment, holding that such a claim is established when it is shown that

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 347 (6th Cir. 2008). The Sheriff argues in his motion for summary judgment that Satterfield fails on all three elements. Motion at 22. The evidence of "dirty looks," a "hostile attitude," and a "hater's club" are not, he argues, sufficiently severe to dissuade a reasonable worker from making or supporting a charge of discrimination. There is also no evidence, he says, that the Sheriff's Office had actual or constructive knowledge of these actions or that anyone in a supervisory or management position condoned, tolerated or encouraged such conduct. Satterfield, in turn, puts up very little resistance against this. As for the first prong, she points out that "a plaintiff's burden of establishing a materially adverse employment action is less

50

onerous in the retaliation context than in the anti-discrimination context." <u>Michael v. Caterpillar Fin.</u> <u>Servs. Corp.</u>, 496 F.3d 584, 595–96 (6th Cir. 2007) (citing <u>Burlington Northern & Santa Fe Ry. Co.</u> <u>v. White</u>, 548 U.S. 53, 67–68 (2006)); <u>see also</u> <u>id.</u> at 596 (describing this standard as "a relatively low bar"). As for the second prong, however, she simply states that "it is unimaginable that supervisors did not know about what she was suffering." Opp. at 38. And as for the third prong, she says nothing.

It is therefore clear that Satterfield has failed to bring forth evidence that would permit a reasonable jury to find that the second and third prongs of the test for coworker retaliation have been satisfied. Satterfield was required, under Rule 56, to bring forth evidence of supervisory notice and condonation, toleration, and encouragement. There is none in the record. Summary judgment is therefore appropriate on this claim as it is alleged against the Sheriff in both his individual and official capacities.

### D. The Intentional Infliction of Emotional Distress Claim

Satterfield's last claim is for intentional infliction of emotional distress. In her complaint, she claims that the Sheriff "knew or should have known that the willful, extreme, and outrageous behavior of the individuals acting on its behalf would result in serious emotional distress for Plaintiff. The conduct went beyond all bounds of decency." Amended Complaint at ¶¶ 86–87. Furthermore, "the mental anguish was serious and of a nature no reasonable person could or should be expected to endure." <u>Id.</u> at ¶ 89. As mentioned earlier, the Sheriff is granted immunity against this claim as it is alleged against him in his individual capacity. <u>Supra</u> Part III.A.2. The following analysis therefore only addresses the claim against him in his official capacity.

In Ohio, the state in which all events pertinent to this claim took place, and whose laws the parties agree govern the claim, a claim for intentional infliction of emotional distress can be proven by showing:

> (1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so extreme as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

Garcia v. ANR Freight System, Inc., 942 F.Supp. 351, 359 (N.D. Ohio 1996) (citing Tschantz v. Ferguson, 97 Ohio App.3d 693, 702 (Ohio Ct. App. 1994); Koenig v. City of Dayton, 28 Ohio App.3d 70, 74 (Ohio Ct. App. 1985); Pyle v. Pyle, 11 Ohio App.3d 31, 34 (Ohio Ct. App. 1983)). The emotional distress suffered need not be accompanied by any physical injury. Yeager v. Local Union 20, 6 Ohio St. 3d 369, 374 (Ohio 1983) abrogated on other grounds by Welling v. Weinfeld, 113 Ohio St. 3d 464, 468 (Ohio 2007). But one can only be liable if his or her conduct has been:

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

Id. at 375.

The Sheriff responds to Satterfield's allegations by claiming that she "has not alleged that she is debilitated or suffers from a severe mental or emotional condition sufficient to constitute severe emotional distress." Motion at 23 (citing Paugh v. Hanks, 6 Ohio St. 3d 72, 78 (Ohio 1983)). Additionally, he argues that "the facts as pleaded do not support a finding of extreme or outrageous conduct by Defendant and would not lead an average member of the community to exclaim,

'outrageous!'" Id. (citing Yeager, 6 Ohio St. 3d at 374 (Ohio 1983)). Satterfield, in turn, argues that "[s]exual assaults, obscene telephone calls, persistent sexual advances, an ominous workplace presence, ostracism, and retaliatory termination" are sufficiently severe. Opp. at 40. She correctly notes that intentional infliction of emotional distress is not designed to address "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Id. (quoting Yeager, 6 Ohio St. 3d at 374–75). And she claims that the actions here stand in sharp contrast to such trivialities because they involved physical contact. Id. (citing and quoting Brewer v. Petroleum Suppliers, Inc., 946 F.Supp. 926, 936 (N.D. Ala. 1996)). Ultimately, however, she claims that the retaliatory termination is "especially outrageous." Id. at 41. "[T]he trauma to Ms. Satterfield was caused not only by the discharge but also by the betrayal of her as a dedicated employee who was harassed by the son of the Sheriff's favorite colleague." Id.

In his reply, the Sheriff argues again that Satterfield has failed to establish that (1) his conduct was so extreme as to go "beyond all possible bounds of decency," and (2) she suffered from severe emotional distress, and that (3) as a matter of law, her allegedly retaliatory termination is not extreme or outrageous enough to inflict emotional distress on its own. Reply at 22–23. The Court agrees with the first point: there is not sufficient evidence in the record to permit a reasonable jury to find that Sheriff's conduct was "so extreme as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community." The only actions of the Sheriff to be considered in this claim are those he took in response to Deputy Mann's harassment. The record shows that the Sheriff responded to the October 3 assault by immediately opening an investigation into the incident. And before that, his top officials, upon receiving word of the complaint, reacted immediately; they passed the allegations up the chain of command, and

one of his top officials, Chief Deputy Barrett, ordered Mann not to have any contact with Satterfield. Furthermore, after the alleged December "don't look at me" incident, the Sheriff assigned Mann to the control center, from which point he would have no contact with Satterfield. These actions are totally insufficient to permit a jury to find that they are "so extreme as to go beyond all possible bounds of decency and . . . such that [they] can be considered utterly intolerable in a civilized community." Summary judgment on this claim is therefore appropriate because Satterfield has not brought forth evidence to support the second prong of the test for intentional infliction of emotional distress.

Satterfield has also failed to carry her burden with respect to the fourth prong of the test for intentional infliction of emotional distress—that the mental anguish she suffered is serious and of a nature that no reasonable person could be expected to endure it. She has pointed to no evidence in the record that would meet this high standard. Whatever mental stress may have resulted from the Sheriff's response to Mann's harassment, no reasonable jury could find that it was so severe that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress generated by the circumstances of the case." Reply at 22 (quoting Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 376 (6th Cir. 1999)). Summary judgment is therefore appropriate for this reason, as well.

## IV. Conclusion

For these reasons, the Sheriff's Motion for Summary Judgment is **GRANTED** on all counts.

**IT IS SO ORDERED.**

Date:  **August 23, 2010**                                        **/s/ John D. Holschuh**
                                                                                 John D. Holschuh, Judge
                                                                                 United States District Court